## Clark v. Smith

*J. Reines Skier*, for petitioner.

*Donald J. Fendrick* and *Michael J. Wetmore,* for respondent.

WILLIAMS, P. J., February 13, 1973.—On June 20, 1972, the court cited Donald Smith, a resident of Woodbourne, New York, to show cause why he should not be (a) removed from his office as executor of the Estate of Ralph J. Williams, and (b) ordered to file an account, pursuant to the petition of his mother, Lucy Gilpin Clark. Petitioner is a niece, and respondent is a grandnephew of testator who died on March 6, 1967, in Palmyra Township, Pike County, Pa., leaving a will in which he gave three-fourths of his residuary estate to petitioner and one-fourth thereof to respondent. The will contained two pecuniary bequests: $5,000 to Isobel Gilpin Pierson, another niece, and $100 to Quentin Smith, another son of petitioner, who, like respondent, was also a grandnephew of testator. Although respondent was not a resident of the Commonwealth, testator appointed him to serve as executor without the requirement of a bond. The will was duly probated on March 10, 1967, and letters testamentary were issued to respondent.

The petition is predicated upon that part of section 331 of the Fiduciaries Act of April 18, 1949, P.L. 512, 20 PS §320.331 (now found in section 3182 of the Probate, Estates and Fiduciaries Code of June 30, 1972 (no. 164), 20 Pa. S. §3182, effective July 1, 1972), which provides:

"The court shall have exclusive power to remove a personal representative when he:

"(1) is wasting or mismanaging the estate, is or is likely to become insolvent, or has failed to perform any duty imposed by law; or

" . . .

"(5) when, for any other reason, the interests of the estate are likely to be jeopardized by his continuance in office."

In support of the contention that respondent should be removed, petitioner alleges under Paragraph 7 of the petition:

"A. The executor has not allowed the petitioner to have access to, use of or share in the benefits of the estate property, both real and personal.

"B. The executor has converted the real and personal property of the estate for his own personal use.

"C. Without the consent of your petitioner, the executor has had a well drilled on the real property held in the estate.

"D. Without the consent of your petitioner, the executor has had constructed a boat house on the real property of the estate for his exclusive use.

"E. The executor has taken possession of the real property of the estate and he has used it for his own purposes without paying any rent.

"F. The executor has not filed an accounting in the said estate during the period of over five years that he has been the executor.

"G. The executor has pledged the credit of the estate by borrowing a large sum of money from the Northeastern National Bank, East Stroudsburg, Pennsylvania, and upon which the estate is paying interest from part of the loan. The estate has not sufficient income from which to pay the loan and there is imminent danger that the property may be sold on execution if the debt is not promptly paid."

In Paragraph 4 of his answer, respondent denies generally the allegations of paragraph 7, but admits, with the approval of petitioner, having borrowed an unspecified sum from the Northeastern National Bank to pay taxes, and impliedly admits failure to file an account. He seeks to justify the failure by attaching a copy of a letter dated June 10, 1971, written by respondent's attorney to petitioner's attorney wherein refer-

ence is made to three prior occasions, June 14, 1969, March 26, 1970, and June 1, 1970, on which respondent and his attorney unsuccessfully solicited petitioner's joinder in a family settlement. The pleadings were supplemented by the testimony of petitioner, respondent, and three witnesses for respondent, received at a hearing held on August 21, 1972.

In order to evaluate respondent's management of the administration, it is necessary to survey briefly (1) the character of the estate, (2) the amount of cash needed to discharge debts and to pay pecuniary legacies, and (3) the steps taken by respondent to achieve settlement of the estate. The real property consists of 92.54 acres of land in Palmyra Township, comprising a 74.5 acre parcel and an 18.04 acre parcel. Route 507 cuts through the property, and the first parcel fronts on Lake Wallenpaupack. On the first parcel, there is an old two-story frame dwelling, a frame work shop, a frame two-car garage, five frame cottages or cabins, and two small frame outbuildings. The value of the real estate, based on the average of two 1967 appraisals, has been estimated at $132,857. Robert R. Clark has occupied Cabin No. 2 for four years, without a written lease, paying a yearly rental of $600; Paul Bachman has occupied his own trailer on the premises for 23 years and now pays $200 per year for the privilege; and a Mr. Snyder also maintains a trailer located on the premises.

Decedent's personal property has been inventoried at a total figure of $4,161.17. Of this amount, $3,358 represents: furniture and household equipment, $649; stamp collection, $150; tools, $855; gun collection, $1,489; camping equipment, $200; and fishing equipment, $15. After subtracting debts and deductions in the amount of $15,436.12, the clear value of the estate is computed to be $121,582.05. On this value, a Penn-

sylvania transfer inheritance tax, at 15 percent is due with interest at 6 percent per annum from one year after the death of decedent. The Federal inheritance tax has been paid with the proceeds of a loan of approximately $12,000 or $13,000, obtained by the executor with the cosignature of petitioner, from the Northeastern National Bank. The interest on the loan, up to the time of the hearing, has been paid out of the rentals from the cabins. A rough and incomplete calculation indicates that the following amounts of cash are needed to settle the estate:

| | |
|---|---:|
| Pennsylvania transfer inheritance tax | $18,237.31 |
| Interest on same, 4 years @ 6% | 4,376.95 |
| Northeastern National Bank loan | 13,000.00 |
| Debts and deductions | 15,436.12 |
| Legacy to Isobel Gilpin Pierson | 5,000.00 |
| Legacy to Quentin Smith | 100.00 |
| | $56,150.38 |

Assuming that all five of the cabins are rented, that all the tenants pay $600 per year, as does Mr. Clark for Cabin No. 2, and that the other trailer licensee, like Mr. Bachman, pays $200 per year, the total yearly receipts from this source would be only $3,400. It is obvious that sufficient cash for a reasonably prompt settlement of the estate can be obtained only by adopting one or the other of the two alternatives: (1) liquidation of the personal property and of part or all of the real property, or (2) supply of the needed cash by one or more persons in exchange for an assignment to the suppliers by the beneficial parties of their respective interests in the estate. From the record, it appears that the executor respondent has attempted only the second alternative.

Initially, respondent acted within his legal rights in assuming possession of the premises, since the testimony clearly established that petitioner was not an occupant of decedent's home at the time of his death: Section 501 of the Fiduciaries Act of April 18, 1949, P. L. 512, as amended by the Act of December 22, 1965, P. L. 1201, 20 PS §320.501 (now found in section 3311 of the Probate, Estates and Fiduciaries Code, 20 Pa. S. §3311, effective July 1, 1972). There is no evidence that petitioner ever had a key to the home, and petitioner cannot legitimately complain that respondent changed the locks and failed to give her a key. It appears, however, that an unfortunate lack of cordiality exists between mother and son. Petitioner testified that, in August 1967, respondent ordered her off the property and physically pushed her into her car although respondent denied ever having done so. The absence of a cordial relationship is more clearly demonstrated by other uncontradicted testimony. Every weekend during the five years following decedent's death, respondent has brought his wife and four children 60 miles from Woodbourne, New York, where they reside, to occupy the old homestead on Lake Wallenpaupack. During this time, petitioner, who lives only seven miles distant at Hawley has been on the premises with respondent four times and in the home proper only on two occasions when she was called there to confer with attorneys. Respondent's presence on the property has inured partly to the benefit of the estate and partly to the benefit of himself and his own family. He has carried out various maintenance operations: mowing 10 acres of lawn, fixing roofs, attending to plumbing, cleaning up a tree cut down by the P. P. & L. Co. after it fell across one of their power lines, cutting down a half-dead maple tree, dragging the road and installing ditches, installing lightening arresters, pressurizing

the water system, and, with the assistance of the tenant, Mr. Clark, replacing the porch of Cabin No. 2. When the old well which supplied the house with water went dry, respondent had a new well drilled. Respondent used lumber found on the premises to erect a new structure, a boat house on the lake where he stored tools and kept his own sailboat. One of the tenants who owns a sailboat was going to pay rent to share the boat house, but he moved away. Immediately prior to the hearing respondent rented the homestead to Donald Kimble, of Hawley, Pa., thus bringing to a close the five-year period following decedent's death during which respondent and his family were the exclusive occupants. In taking possession of decedent's personal property, respondent gave special attention to certain selected items. On the Saturday and Sunday, March 11, and 12, 1967, immediately following decedent's death, respondent and a friend loaded the guns, the fishing tackle, a lot of camping equipment and other articles into trucks and removed them to respondent's home in New York State where they have been stored for the last five years. Apparently, the guns are regarded as especially valuable inasmuch as respondent chose to obtain a policy of insurance covering this portion of decedent's personal assets. It would have been more consistent with an avowed purpose to safely keep this property if respondent had itemized the articles before removing them from this State. In the appraisal attached to respondent's answer dated May 3, 1967, almost two months after the articles had been removed to New York, and made by Stuart Smith, of Jermyn, Pa., these articles are lumped together as follows:

| | |
|---|---:|
| "Guns | $1489.00 |
| "Camp Equip. | 200.00 |
| "Fishing Equip. | 15.00" |

Although counsel have not raised the point, such lumping is clearly improper: In re Estate of Katherine J. Fay, etc., 31 Erie 312 and 343 (O.C. Erie Co., 1948).

A survey of the record shows that the preeminent reason for considering the removal of respondent is that he has devoted the five years of his administration, not to seeking prompt settlement of the estate, but to pressing petitioner for an agreement to release her interest therein. In Branagan Estate, 78 Montg. 51, 57 (O.C. Montgomery Co., 1960), President Judge Taxis said:

"The function of the executor is to wind up the estate as promptly as possible and to make distribution. Thus, in the absence of an appropriate provision in the will or specific statutory authority the personal representative has no right to continue the decedent's business beyond a reasonable period of time. If he does so, he proceeds at his own peril; he will be surcharged for any losses, and all benefits or profits will inure to the estate."

When this estate was before the court in November 1968, counsel represented that the necessity for an accounting might be obviated because a family settlement was *then* under serious consideration. It is quite true that the duty of a fiduciary to account may be eliminated by a family settlement, but, to have this effect, the settlement must have been actually executed by all of the parties in interest: Schultz Estate, 374 Pa. 459, 98 A. 2d 176 (1953); Hanna Estate, 379 Pa. 136, 108 A. 2d 703 (1954). Four years have passed since that representation was made, and no family settlement has been concluded. Meanwhile, the beneficiaries have been deprived of the distributions to which they are entitled, and the ultimate value of the estate is being progressively diminished by the amount of interest chargeable for the Northeastern National

Bank loan and the unpaid Pennsylvania transfer inheritance tax. In effect, respondent has been purchasing, at the expense of the estate, time within which to extend his repeated efforts to obtain a release of interest from petitioner. The letter of June 10, 1971, addressed by respondent's attorney to petitioner's attorney reads, in part:

"In regard to a judicial sale of the real estate, it was my understanding that Mrs. Clark was considering our offer. To reiterate our offer of June 14, 1969, and March 26, 1970, was as follows:

| | |
|---|---|
| "$ 50,000.00 | Less Proportionate Share of Expenses, Taxes, Interest, Costs, etc., Within 30 days of Signing. |
| "$ 50,000.00 | One Year Later. |
| "$ 50,000.00 | Two Years After Signing. |
| "$ 20,000.00 | Three Years After Signing. |
| "$170,000.00 | |

"This proposal would entail Mrs. Clark accepting a second mortgage.

"On June 1, 1970, we offered an alternate, $155,-000.00 less expenses, in full at the signing of a family agreement releasing all her right, title and interest in the property and in the estate.

"As of this date, I have never received your opinion on either of the above.

"Please advise."

The testimony indicates that petitioner is especially vulnerable to a campaign of this character. At the time of the hearing, she was a widow, 65 years of age, without independent income, who has been employed for 12 years by the Sherman Underwear Company at Hawley, Pa. She works there in the finishing depart-

ment, 8 to 10 hours per day, at a job which requires standing much of the time. The letter of June 10, 1971, offered by counsel for respondent as a justification for delay, produces a diametrically opposite effect when read in the light of the foregoing circumstances. It is unconscionable that a woman of petitioner's age and economic situation should be pressed to bargain away her lawful interest in the estate of an uncle who intended to provide generously for her, in order to receive anything at all from the hands of the uncle's executor. The solicitation of a beneficiary to release his interest is not necessarily improper, where it is accompanied by fair disclosure of pertinent information: Fritz Estate, 52 D. & C. 2d 483, 485, 486, 487 (O.C. Lawrence Co., 1970). Here, the delay in settlement of the estate is due to the fact that the executor has been more zealous in pursuing his own interests rather than the early distribution of the estate.

Counsel for respondent have cited a number of decisions holding that it is an abuse of judicial discretion to take the drastic action of removing an executor unless there is clear evidence that he is wasting or mismanaging the property, or that the property or interests of the estate will be jeopardized by his continuance in office. Examination of the factual situations, those presented as constituting abuse, are distinguishable from the instant case. In Glessner's Estate, 343 Pa. 370, 22 A. 2d 701 (1941), Josiah Landis Glessner was coexecutor of his father's estate and sole lifetime beneficiary of a trust fund administered by the Union Trust Company of Pittsburgh. All of the real estate, except one parcel consisting of a hotel, a livery stable, and a two-story frame building, had been sold and the proceeds paid into the trust fund. For 11 years, Glessner had exclusive possession of the hotel, obtaining some income from tourists occasionally accommodated there

and receiving the rentals paid by the tenants of the frame building and livery stable. The lower court granted the trustee's petition to remove the coexecutor on the ground, inter alia, that by failing to make an effort to sell the property, he was mismanaging the property for his own personal advantage. On appeal, the Supreme Court reversed and held that, since Glessner was the *sole* beneficiary of the income of the fund that might be derived from renting or selling the property, he should be permitted to choose between occupying the property or receiving the income. Here, respondent holds only a one-fourth interest in the residuary estate while petitioner is the holder of the other three-fourths. His occupancy, extended beyond the time necessary for prompt settlement of the estate, deprives her of an increasing portion of the beneficial interest to which she is entitled.

In Beichner Estate, 432 Pa. 150, 247 A. 2d 779 (1968), the Supreme Court reversed an order removing a coexecutrix because (1) the order was entered without conducting a hearing, solely pursuant to a motion for judgment on the pleadings, and (2) the order was based solely upon a finding of animosity per se, without any showing that such animosity had resulted in any loss, present or future, to the estate. Here, not only did the court conduct a hearing, but the testimony demonstrated the progressive depletion of the estate by interest charges. On the other hand, the Supreme Court found no abuse and affirmed orders removing executors in two other cases cited by counsel for respondent.

In Quinlan Estate, 441 Pa. 266, 273 A. 2d 340 (1971), the lower court had removed Quinlan as coexecutor on two grounds: (1) that his general lack of concern toward the estate was likely to jeopardize the interests of the estate if he were allowed to continue as execu-

tor, and (2) that he was insolvent. The Supreme Court affirmed on the second ground, but found that the first ground was not supported by the record. On the contrary, the evidence showed that Quinlan had taken an *active* part in the attempt to sell the corporate stocks of the Quinlan companies. He personally contacted prospective purchasers, such as Libby, McNeill & Libby, the Nestle Company, and the W. R. Grace Company, and participated vigorously in the debate over two main offers, one from Helms and the other from the Ward Company. But for this evidence of activity, the Supreme Court would have concurred with the first ground relied upon by the lower court. This consideration affords some basis for inferring that the Supreme Court would approve an order removing respondent, since the record in the instant case is devoid of evidence showing comparable activity on his part.

The second case, Scientific Living, Inc. v. Hohensee, 440 Pa. 280, 296, 297, 270 A. 2d 216, 224, 225 (1970), from which counsel for respondent quotes a headnote, involved not only the mismanagement and waste of an estate, but a shockingly brazen imposition upon the Court of Common Pleas of Lackawanna County and the United States District Court of the Eastern District of Virginia. There, the Supreme Court affirmed an order removing Thelma Tompkins and Alma Arzoo from their office as coexecutrices of the estate of their deceased brother, Adolph Hohensee. Mr. Justice (now Chief Justice) Jones said:

"The court below concluded that 'on the whole record before the court, the interests of the estate are likely to be jeopardized by their continuance as executrices.' With that conclusion we are in full accord. The conduct of these two women fully justified the drastic action of their removal as personal representatives by the court below."

Adolph Hohensee was survived by an adult daughter, Virginia Beadle; a minor daughter, Lynda Euphemia Hohensee; a brother Ervin Hohensee; and two sisters, Thelma Tompkins and Alma Arzoo. In his will, he distributed his residuary estate as follows: one-eighth to Thelma Tompkins, one-eighth to Alma Arzoo, one-fourth to Virginia Beadle, and one-half in trust for Lynda Euphemia Hohensee until she attains 21 years of age. Virginia Beadle, Thelma Tompkins and Alma Arzoo were nominated and later became executrices of the estate. When testator died, he owned 4,382 out of 4,417 issued shares of stock in Scientific Living, Inc. The principal asset of this corporation was a large tract of land, valued at approximately $1,000,000, situated in Lackawanna County. While Adolph Hohensee was in jail, his brother Ervin Hohensee had contrived to obtain and record two deeds conveying title to this land from the corporation to himself, without proper authorization and for no consideration. Proceedings to annul the conveyances were pending in the Court of Common Pleas of Lackawanna County when Ervin Hohensee brought an action concerning title to the land against Scientific Living, Inc., in the United States District Court for the District of Eastern Virginia. Service of process was made upon Thelma Tompkins, secretary-treasurer of defendant corporation, while she was visiting in Washington, D. C. Thelma Tompkins gave depositions and, with Alma Arzoo, connived to secure from the Virginia court what amounted to a consent decree, purporting to confirm Ervin Hohensee's title. The Lackawanna County court first learned of the decree of the Virginia court when Ervin Hohensee attempted to plead it as res judicata in exceptions to the decree of the Lackawanna court annulling the two deeds. The court en banc denied the exceptions, and the Virginia court,

upon learning of the imposition which had been practiced, set aside its own previous order. It was against this factual background that the Orphans' Court Division of the Court of Common Pleas of Lackawanna County acted to remove Thelma Tompkins and Alma Arzoo as executrices. Although the element of flagrant imposition upon the court is missing from the instant case, there does remain the element of mismanaging and wasting the estate. In Scientific Living, Inc., this was to have been accomplished by a single decree from a Federal court; here, it is actually being accomplished by a process of gradual attrition. There does not appear to be any good reason for holding that the former is improper and that the latter is proper.

There can be no reasonable dispute that respondent, in order to serve his own self-interest, has not fulfilled his duty to promptly dispose of the assets of decedent's estate. The delay here present was caused by respondent's persistent efforts to persuade the principal beneficiary to agree to accept his offer to purchase the real estate. The self-interest of respondent conflicts with his duty to properly administer decedent's estate and requires us to take the drastic action of removing him from office.

ORDER

And now, February 13, 1973, defendant Donald Smith is hereby removed from his office as executor of the estate of Ralph J. Williams, deceased, and is directed to file an account of his administration of the said estate within 60 days after receiving notice of this order. The register of Wills is directed to issue letters of administration (d.b.n.c.t.a.) in the said estate to a properly qualified successor.